J-A01017-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.M.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.P., MOTHER | : | |
| | : | No. 1120 EDA 2017 |

Appeal from the Decree and Order Entered March 6, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.: CP-51-AP-0000-577-2016
CP-51-DP-0000131-2014

BEFORE: LAZARUS, J., OTT, J., and PLATT*, J.

MEMORANDUM BY PLATT, J.:                          **FILED APRIL 16, 2018**

K.P. (Mother) appeals the decree of the Court of Common Pleas of Philadelphia County (trial court), entered March 6, 2017, that terminated her parental rights to her son, Z.M.P. (Child), born in March of 2013, and the permanency review order that changed Child's permanency goal to adoption.[1] We affirm.

On April 16, 2013, Department of Human Services (DHS) received a General Protective Services (GPS) report alleging that Mother was unable to care for Child, who was four weeks old at the time. Mother admitted to anxiety attacks and said she was uncomfortable caring for Child. Mother was diagnosed as schizophrenic and bipolar and was prescribed psychotropic

---

* Retired Senior Judge assigned to Superior Court.

[1] The trial court also terminated the parental rights of Child's father, I.W. (Father), on March 6, 2017. Father did not appeal that termination and he is not a party to this appeal.

medication, but she did not believe it was working. Mother resided with her mother, a nurse. The report was determined valid and the reporter was advised to contact the police if Mother was in crisis. (*See* DHS Exhibit 1; N.T. Hearing, 11/29/16, at 13-14).

A safety plan had been devised with Father and Maternal Grandmother by the staff at Friends Hospital after Mother was admitted suffering from major depression with psychosis and hearing voices. (*See* DHS Exhibit 2). Maternal Grandmother and Father did not follow the safety plan when they subsequently left Child in Mother's care without supervision, and Mother attempted suicide. (*See id.*).

DHS implemented a new safety plan and Family Service Plan (FSP) that required line-of-sight supervision of any contact between Mother and Child after Mother admitted her inability to care for Child and her fear of being left alone with him. (*See* N.T. Hearing, 11/29/16, at 11-12).

On December 19, 2013, DHS received a GPS report that Mother had again been left alone with Child, now eight months old, in violation of DHS' line-of-sight safety plan. (*See id.* at 9-10; DHS Exhibit 3).

The December 19, 2013 GPS report led to the removal of Child, who was adjudicated dependent and committed to DHS on January 27, 2014, with Child to be in the physical custody of his maternal great-cousin. Mother was referred to Behavioral Health Services (BHS) for an evaluation and for a

Parenting Capacity Evaluation (PCE). Visitation with Child was to be supervised. (**See** N.T. Hearing, 11/29/16, at 8; DHS Exhibit 4).

The trial court placed Child with Paternal Grandmother on March 7, 2014, where he remained at the time of the termination hearings. At a hearing on April 28, 2014, the trial court ordered Mother re-referred to BHS where she was to avail herself of, or in the alternative, to provide documentation of, her mental health services. The trial court also re-referred Mother for a PCE and referred her to the Achieving Reunification Center (ARC) for parenting and housing services.

A new FSP, established in July of 2014, required Mother to address and to document her mental health issues and comply with all recommendations; locate and occupy suitable housing; attend all court hearings and other meetings; attend Child's medical appointments; attend supervised line-of-sight visits; comply with all court orders; comply with ARC services; and comply with the PCE evaluation. (**See** N.T. Hearing, 11/29/16, at 16-17).

Mother's whereabouts became unknown to DHS as of October 22, 2014, when DHS was forced to do a Parent Locator Search for Mother. Once found, Mother admitted to not visiting Child in 2014 after having "hit bottom" on drugs and spending the year in a recovery home. (N.T. Hearing, 1/30/17, at 58).

As of January 21, 2015, Mother was not compliant with her permanency plan. Mother had not visited Child in three months and had not signed

releases to permit the Community Umbrella Agency (CUA) to assess her current services. Mother remained in a recovery home as of December 2015, and attended the Nu-Stop dual diagnosis treatment program.

Mother attended parent-child psychotherapy with Child, an evidence-based trauma intervention aimed at enhancing the parent-child relationship. (*See* N.T. Hearing, 1/10/17, at 15). Mother's attendance in parent-child therapy was an updated FSP goal and Mother was consistent in her attendance. (*See* N.T. Hearing, 11/29/16, at 60; N.T. Hearing, 1/10/17, at 14, 28). The goal of the therapy was to permit Mother and Child to get to know each other again after the break in their relationship. (*See* N.T. Hearing, 1/10/17, at 18). Mother completed her drug and alcohol program at Nu–Stop in December of 2015. (*See* N.T. Hearing, 1/30/17, at 10). The goal of treatment at the drug and alcohol program was both sobriety and to ensure Mother kept up with her medication for depression. (*See id.* at 20).

Nu-Stop did not work on specific mental health treatment for Mother. Community Behavioral Health (CBH) documented seven inpatient hospitalizations for Mother between January of 2012 and July 2014. (*See id.* at 35-36). Mother attended a medication management and treatment program between 2014 and 2015 and then re-engaged in treatment in January 2016. (*See id.* at 40-41). She did not engage in medication management between December 2015 and January 2017. (*See id.* at 48, 50). Upon her re-entry to the program in January of 2016, Mother's

attendance was sporadic. (*See id.* at 37). Mother was attending therapy monthly at the time of the termination hearing. (*See id.* at 77).

On July 15, 2016, Mother completed a PCE. At the time of her evaluation, Mother was enrolled in mental health treatment, but was not prescribed medication. Her treatment records provided inconsistent information about her mental health history as her present diagnosis was not in alignment with her psychiatric history. (*See* N.T. Hearing, 11/28/16, at 45-46; DHS Exhibit 5, at 9-10). Mother had reported significant history of hospitalizations for her mental health problems going back to 18 years of age. (*See* N.T. Hearing, 11/28/16, at 48; DHS Exhibit 5, at 7).

Mother reported a history of self-harm by cutting. (*See* N.T. Hearing, 11/28/16, at 52). Mother's psychiatric records were inconsistent, showing no predictable pattern for attendance and treatment. There was no indication that she addressed her prior symptoms or her chronic history of hospitalization. (*See id.* at 56). Mother's substance abuse history was inconsistent. (*See id.* at 57). Mother had provided different information to different professionals, making an accurate diagnosis of her mental health difficult. (*See id.* at 59). Mother's inconsistent mental health and substance abuse history precluded her ability to provide safety for Child according to her permanency plan at the time of her PCE. (*See id.* at 59-60).

At the hearing in this matter, DHS presented the testimony of psychologist, Erica Williams, Ph.D. Dr. Williams's foremost recommendation

was to address the discrepancies in Mother's inconsistent histories across multiple domains to discern her mental health needs and identify appropriate treatment. A complete, comprehensive understanding of Mother's mental health was required. (*See id.* at 54-55).

In July of 2016, Dr. Williams commenced a bonding evaluation of Mother and Child that she completed in October 2016. (*See id.* at 60-61). While she found a positive bond between Mother and Child, Dr. Williams opined that severance of the relationship would not cause irreparable harm to Child because Child had been removed from Mother at eight months due to Mother's inability to care for Child. (*See id.* at 66-67). Thereafter, there was a substantial period of time where Mother was not involved in Child's life. She returned to seeing him in 2014, but has never progressed beyond supervised visits. (*See id.*) Dr. Williams testified that "[Mother has] never been in a position to provide care to [Child] or for him to see her as a central caregiver." (*Id.* at 66). Mother and Child do not share a parent-child bond. (*See id.* at 67).

Child has been thriving in the care of his caregiver, Paternal Grandmother, who fulfills the central role in Child's life. (*See id.* at 73). Child's healthy attachment with his caregiver will preclude any harm to Child by the termination of Mother's parental rights and promote a healthy life for Child. (*See id.*).

On October 20, 2016, DHS filed petitions to terminate the parental rights of Mother, and to change Child's goal to adoption. The trial court held hearings on those petitions on November 28, 2016, November 29, 2016, January 10, 2017, and January 30, 2017. Testifying for DHS were psychologist, Erica Williams, Ph.D.; Paternal Grandmother, T.K.A.; DHS social worker, Juliet Scully Bennett; Turning Points for Children case aide, Frankie Occassio; and CUA caseworker, Desiree Rose. Mother testified on her own behalf and presented the testimony of licensed social worker, Una Majmudar; Nu-Stop worker, Henry Garcia; and visitation coach, Dante Adams.

Prior to the commencement of the hearing on November 28, 2016, the trial court, after argument, denied Mother's motion *in limine* to exclude the testimony of Dr. Williams.

The trial court entered its decree terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b), and its order changing Child's goal to adoption on March 6, 2017. Mother filed her notice of appeal and concise statement of errors complained of on appeal on April 4, 2017, and a supplemental concise statement on April 14, 2017.

Mother raises the following questions for our consideration:

1. Did the trial court commit an error of law and abuse of discretion by denying [Mother's] Motion *in Limine*, where DHS failed to prove that their expert's methodology for the Parenting Capacity Evaluation was "generally accepted" in the field of psychology, as required by Pa. R.E. 702(c) and ***Grady v. Frito-Lay, Inc.***, 839 A.2d 1038 (Pa. 2003)?

2. Did the trial court commit an error of law and abuse of discretion, and deny [Mother] due process, when it denied [Mother's] request for a hearing regarding the expert's methodology, and whether it was "generally accepted" in the field of psychology?

3. Did the trial court commit an error of law and abuse of discretion, and deny [Mother] due process of law, by denying [Mother's] request to retain and present the testimony of an expert?

4. Did the trial court commit an error of law and abuse of discretion, and deny [Mother] due process of law, by limiting [Mother's] cross-examination of DHS's expert witness, including examination of her methodology?

5. Did the trial court commit an error of law and abuse of discretion by relying on an expert report that was not reliable and used methodology that was not "generally accepted" in the field of psychology, as required by Pa. R.E. 702 and **Grady v. Frito-Lay, Inc.**, 839 A.2d 1038 (Pa. 2003)?

6. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa. C.S. § 2511 (a)(2), (a)(5) and (a)(8), where DHS failed to prove the necessary grounds by clear and convincing evidence?

7. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa. C.S. § 2511 (a)(5) and (a)(8), where DHS failed to prove by clear and convincing evidence that termination of the parental rights would best serve the Child's needs and welfare?

8. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa. C.S. § 2511 (b) where DHS failed to provide clear and convincing evidence that termination would further the developmental, physical and emotional needs and welfare of the child, and where all of the witnesses testified to the strong positive bond shared between [Mother] and her child, and the evidence established that severing the bond would be harmful to the Child.?

- 8 -

9. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa. C.S. § 2511 (a) and (b), where DHS failed to meet its evidentiary burden of clear and convincing evidence?

10. Did the trial court commit an error of law and abuse of discretion by changing the permanency goal of the Child from reunification to adoption pursuant to the Juvenile Act, where DHS failed to provide sufficient evidence of the continued necessity for placement, and where the evidence showed that [Mother] was fit to parent, was in full compliance with her single case plan goals, and was ready, willing, and able to assume custody of her child at the time of the hearing?

11. Did the trial court commit an error of law and abuse of discretion by changing the Child's permanency goal from reunification to adoption pursuant to the Juvenile Act, when all of the witnesses testified to the positive bond shared between [Mother] and [Child], and where DHS failed to provide sufficient evidence that that [sic] such a goal change would be best suited for Child's needs and welfare?

12. Did the trial court commit an error of law and abuse of discretion under the Juvenile Act by failing to ensure that the views of the [C]hild were fully ascertained and taken into consideration when deciding to change the goal to adoption and terminate parental rights?

13. Did the trial court commit an error of law and abuse of discretion when it failed to appoint a separate, independent attorney to represent the [C]hild's legal interest in the termination of parental rights and goal change hearing?

14. Did the trial court commit an error of law and abuse of discretion when it terminated parental rights without ensuring that the [C]hild's legal interests were expressed or represented at the termination proceeding, as guaranteed by 23 Pa. C.S. § 2313(a)?

(Mother's Brief at 7-10).

Mother's argument does not correspond to the questions raised. Her brief is not "divided into as many parts as there are questions to be argued[,]"

but rather is divided into seven sections, all with numerous subsections. Pa.R.A.P. 2119(a); (*see* Mother's Brief, at 30-62). Furthermore, many of Mother's listed questions are redundant. Thus, for ease of disposition, we have rephrased Mother's questions to remove repetition and better correlate with the argument section of her brief. Therefore, we consider the following six questions:

> 1. Whether the trial court erred or abused it discretion when it denied Mother's motion *in limine* to preclude Dr. Williams's testimony because Dr. Williams's methodology in conducting a parenting capacity evaluation was not generally accepted in the field of psychology pursuant to Pa.R.E. 702(c) and ***Grady v. Frito-Lay, Inc.***, 839 A.2d 1038 (Pa. 2003)?
>
> 2. Whether the trial court erred or abused its discretion when it denied Mother permission to engage her own expert?
>
> 3. Whether the trial court erred or abused its discretion when it limited Mother's cross-examination of Dr. Williams?
>
> 4. Whether the trial court erred or abused its discretion when it terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b)?
>
> 5. Whether the trial court erred or abused its discretion when it changed Child's goal to adoption?
>
> 6. Whether the trial court erred or abused its discretion where it failed to consult with Child and to ensure that Child's legal interests were represented?

Our standard of review for an order terminating parental rights is well settled.

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will

- 10 -

reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

We will first consider Mother's issues surrounding Dr. Williams's testimony. Mother claims the trial court should have excluded Dr. Williams's testimony because her methodology was not generally accepted in her field. (*See* Mother's Brief, at 30-38). Specifically, she argues that Dr. Williams's parenting capacity evaluation did not meet the American Psychological Association guidelines. Thus, she contends that the trial court violated the *Frye*[2] rule when it permitted Dr. Williams to testify. We disagree.

---

[2] *Frye v. U.S.*, 293 F. 1013 (1923).

- 11 -

In reviewing the trial court's decisions with respect to admissibility of evidence, "the resolution of its evidentiary conflicts . . . will not be disturbed unless they lack support in the record or represent an abuse of discretion or error of law." *In re A.L.D.*, 797 A.2d 326, 338 (Pa. Super. 2002) (citation omitted).

Pennsylvania Rule of Evidence 702(c) states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . (c) the expert's methodology is generally accepted in the relevant field." Pa.R.E. 702(c). "Under *Frye,* novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1044 (Pa. 2003) (citation omitted). "Nor does the *Frye* standard even require an optimal methodology, just an accepted one." *Cassell v. Lancaster Mennonite Conference*, 834 A.2d 1185, 1190 (Pa. Super. 2003).

Here, the trial court explained that it denied Mother's motion *in limine*, and permitted Dr. Williams to testify about the parental capacity evaluation, because the expert guidelines promulgated by the American Psychological Association, were a suggestion, not a mandatory standard. (**See** N.T. Hearing, 11/28/16, at 15, 18, 22). Dr. Williams explained that although she performed some interviews and evaluations as recommended by the guidelines, her decision not to perform a parenting child interaction in this

specific evaluation would be generally accepted in her field, even though the guidelines recommended performing one.  (**See id.** at 30).

Upon review, we conclude that the record supports the trial court's decision to deny Mother's motion *in limine* to exclude Dr. Williams's testimony about the parental capacity evaluation.  Mother did not prove that the scientific community did not generally accept the methods of obtaining and evaluating data that Dr. Williams employed, thus she has not proven that the trial court erred or abused its discretion.  **See Grady**, **supra** at 1044; **Cassell**, **supra** at 1190.  Mother's first issue does not merit relief.

In the second issue, Mother argues that the trial court erred when it denied her permission to retain a rebuttal expert witness to rebut the testimony of DHS's expert.  (**See** Mother's Brief, at 30-32).  Specifically, she claims that denial of her request amounted to a denial of her right to meaningfully participate in her defense because the expert who testified was not neutral.   We disagree.

"Generally the admission of rebuttal evidence is a matter within the sound discretion of the trial court."  **Am. Future Sys., Inc. v. BBB**, 872 A.2d 1202, 1213 (Pa. Super. 2005), *aff'd*, 923 A.2d 389 (Pa. 2007), *cert. denied*, 552 U.S. 1076 (2007) (citation omitted).

In the instant case, during a hearing on November 4, 2016, counsel for Mother explained that she had made a motion for an expert witness that the court had denied, but was now putting such motion in writing.  (**See** N.T.

Hearing, 11/04/16, at 9; **see also** Motion for Allowance of Fees for Parenting Capacity Assessment, 11/04/16).[3] The trial court explained that it denied the motion because at that point in the case, after the period set forth for discovery had long since closed, and given that the reason for the expert was to cross-examine some of the protocol offered by the parenting capacity evaluation, an expert witness was not necessary because counsel for Mother would simply be able to cross-examine the expert offering the evaluation. (**See** N.T. Hearing, 11/04/16, at 9-10).

Upon review, we conclude that the trial court did not abuse its discretion when it denied Mother's request for a rebuttal witness, where the court concluded that the purpose for which the expert would be offered could be accomplished through cross-examination of DHS's expert. **See Am. Future Sys., Inc.**, **supra** at 1213. Accordingly, Mother's second issue does not merit relief.

In her third issue, Mother claims that the trial court abused its discretion when it limited her counsel's cross-examination of Dr. Williams. (**See** Mother's Brief, at 37-38). We disagree.

"The admission or exclusion of evidence . . . is within the sound discretion of the trial court." **In re K.C.F.**, 928 A.2d 1046, 1050 (Pa. Super. 2007), *appeal denied*, 936 A.2d 41 (Pa. 2007) (citation omitted); **see also**

---

[3] The certified record does not contain a copy of the earlier motion for an expert witness, or its denial.

Pa.R.E. 611 (granting trial court authority to exercise reasonable control over the examination and presentation of witnesses).

Here, the record reveals that, in addition to her cross-examination of Dr. Williams about her qualifications, Mother's counsel cross-examined Dr. Williams at length (encompassing seventy-eight pages of testimony) before the trial court finally intervened:

> THE COURT: Your objection is on the record. So, at this point your cross is finished. Can the doctor be excused, [directed to DHS' counsel]?
>
> [MOTHER'S COUNSEL]: Your Honor, this is a constitutional right to hear me. I feel like I should have the right to present my case.
>
> THE COURT: You have a right to present your case. There's also a Rule of Evidence that the [c]ourt is entitled and has discretion to you know when we get to a certain [point] about inefficiency you know you've been presenting your case, approximately, well, you didn't present your case yet. You've just been cross examining.
>
> [MOTHER'S COUNSEL]: I have not.
>
> THE COURT: You've just been cross examining the witness.
>
> [MOTHER'S COUNSEL]: I have not been able to. You told me several times that I would be able to cross examine this witness.
>
> THE COURT: You did. We've been here now, it's four forty in the afternoon --
>
> [MOTHER'S COUNSEL]: I'm protesting.
>
> THE COURT: -- and we started at two o'clock.
>
> [DHS' COUNSEL]: Your Honor, respectfully, counsel has to ask the appropriate questions in the appropriate form.
>
> THE COURT: Absolutely.

- 15 -

[DHS' COUNSEL]: That's what happens in a court of law.

THE COURT: It's cross examination. You're allowed to cross examine. You have to ask the questions and when --

[MOTHER'S COUNSEL]: And what I would like to do is --

THE COURT: -- there's an objection to relevance --

[MOTHER'S COUNSEL]: -- go through this --

THE COURT: You know, the DHS has not finished presenting their case[.] So you're being entitled to cross examine any other witnesses and then it's your witnesses.

[MOTHER'S COUNSEL]: This is the witness I need to cross examine. I would like to go through the psychological evaluations and have Doctor Williams show me what is inconsistent.

[CHILD ADVOCATE]: And, Your Honor, respectfully, it is asked and answered because [Mother's Counsel's] own response she started with, 'When Doctor Williams said.' She's asked the question before. Doctor Williams gave her answer. She may not be satisfied with that answer but [Doctor Williams] did answer the question of what she thought the discrepancies were.

THE COURT: Correct. So, at this point, cross examination by [Mother's Counsel] and Doctor Williams is done. And your objection is noted on the record.

(N.T. Hearing, 11/28/16, at 148-50).

Upon review, we conclude that the trial court did not abuse its discretion when it finally ended Mother's counsel's cross-examination of Dr. Williams. *See In re K.C.F.*, *supra* at 1050; Pa.R.E. 611. Mother's counsel was permitted ample time to cross-examine Dr. Williams. Mother's third issue does not merit relief.

In her fourth issue, Mother claims that the trial court erred when it terminated her parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b). (*See* Mother's Brief, at 38-54). We disagree.

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Requests to have a natural parent's rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(8), (b).

It is well-settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re T.F.***, 847 A.2d 738, 742 (Pa. Super. 2004) (citation and internal quotation marks omitted). Further,

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

***In the Interest of K.Z.S.***, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

Furthermore, the Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). The Act does not make specific reference

- 18 -

to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. ***See In re E.M.***, 620 A.2d 481, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. ***See In re K.K.R.-S.***, 958 A.2d 529, 533 (Pa. Super. 2008).

Here, at the time of the hearing, Child had been in placement and living with Paternal Grandmother since he was eight months old, some thirty-six months. (***See*** N.T. Hearing, 11/29/16, at 49). Mother's FSP goals were: 1) participate in and complete individual and parent-child therapy; 2) obtain appropriate housing; 3) visit with Child consistently. (***See id.*** at 60).

Mother completed parent-child therapy but Ms. Rose testified her individual therapy was, "ongoing." (***Id.***). According to Dr. Williams, Mother "has been provided multiple diagnosis [sic] reflective of the symptoms she reports at that time[,]" and though she denied any symptoms during the PCE, "[i]t is imperative she begin to attend treatment on a consistent basis to help support the development of an accurate diagnosis and appropriate treatment recommendations." (DHS Exhibit 5, Parenting Capacity Evaluation, 7/15/16, at 13). Dr. Williams recommended that Mother engage in weekly therapy that focused "beyond her experiences of being court[-]involved with her son and include developing an accurate narrative of her history." (***Id.***). She also recommended that Mother's therapy focus on "the role [Mother] played in her son's removal and the role she continues to play in his ongoing placement."

(*Id.*). Dr. Williams cautioned, "Given her history of providing inconsistent information, it is recommended her therapist collaborate with CUA/DHS and any behaviors of concern, child related events or positive experiences/changes are communicated to the therapist." (*Id.*). Dr. Williams' recommendations make it clear to us that Mother's individual therapy is, indeed, still ongoing, and that, far from having completed it, Mother has yet to be diagnosed consistently and has yet to engage in consistent treatment. The state of Mother's mental health remains a primary concern.

Mother did not have appropriate housing for herself and Child at the time of the termination hearing. Mother resided with her mother at the time of the hearing. The CUA referred Mother to housing for herself and Child but Mother rejected the offer because she would have to abide by certain rules and Mother "just didn't want to be living under rules and regulations." (N.T. Hearing, 11/29/16, at 62). Mother's lack of housing also remains an ongoing concern.

Mother did not see Child for approximately a year after he went into placement. Her visitation has been consistent since she came back into his life in 2014, but visits have never progressed beyond two line-of-sight supervised visits per week. (*See* N.T. Hearing, 11/28/16, at 66).

We are persuaded that the termination of Mother's parental rights will best serve Child's needs and welfare. Dr. Williams testified:

        . . . [I]n this case[,] there's no question that [Child] and
[Mother] have a bond and that [Child] enjoys his time with
[Mother].

        However, when you look at the history of the case[,] [Child]
had DHS involvement very early on.  And it was determined at
that time that [Mother] could not be the sole caretaker of [Child].
That at any given time another adult had to be affecting the care
[of Child] and have line of sight supervision.

*    *    *

        She did return to being involved in his life in 2014 and since that
time her relationship with him had not progressed past
supervised visits.  She's never been in a position to provide care
to him or for him to see her as a central caregiver.  Rather[,] her
contact with him whether it's in the kinship home or in the
visitation or the child[-]parent project is always with another
adult assuring that his needs are met and that he's being taken
care of.

(***Id.***).

Dr. Williams testified that there is a bond between Mother and Child but, "though positive, is not one of a caregiver child bond." (***Id.*** at 67). Dr. Williams reported that Child, "[is] doing very well in his current environment[,]" and that "[t]here[ are] no concerns in his current placement." (***Id.***). She noted, "[Mother] herself identified that the [P]aternal [G]randmother was a good place for him." (***Id.***). Dr. Williams concluded, "And all of those different things build into the fact that though [Child] would know that the bond was over, with appropriate support and structure and therapy[,] if needed[,] there would not be irreparable harm if he no longer had contact with [Mother] two hours a week." (***Id.***).

- 21 -

Paternal Grandmother is and has been Child's sole caregiver since he was eight months of age. Mother has been a recent visitor and, though she has been a consistent and apparently welcome visitor, she has been no more than that. The termination of Mother's parental rights will best serve Child's needs and welfare by providing Child with a safe, permanent home.

Our review of the record reveals that DHS presented sufficient credible evidence to permit the trial court to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8). There is no question that Child has been in placement in excess of twelve months. The conditions that led to Child's placement still exist in that Mother has failed to secure appropriate housing and has failed to address her mental health. Finally, Child's needs and welfare will be served by the termination of Mother's parental rights in that he will be assured of a safe, permanent home with Paternal Grandmother who has demonstrated that she is an appropriate and loving caregiver for Child. Accordingly, we conclude that the trial court did not abuse its discretion when it terminated Mother's parental rights pursuant to subsection (a)(8).

Much of what we have said and quoted above about the needs and welfare of Child also informs our analysis under 23 Pa.C.S.A. § 2511(b), where we consider the developmental, physical and emotional needs and welfare of a child. Child has been residing with Paternal Grandmother and the record demonstrates that he is thriving in that environment. (*See id.* at 65-67). The absence of a parent-child bond between Mother and Child, and Child's close

caregiver-child relationship with Paternal Grandmother both show that termination will serve his emotional needs and welfare. We are also persuaded by Dr. Williams' opinion of the effect on Child if he were to be removed from Paternal Grandmother's care. According to Dr. Williams, "[I]f [Mother] was removed from [Child's] life, he already has an established, healthy relationship. He's been thriving in the care of [Paternal Grandmother]. And that disruption[,] though it may affect him[,] it would not [irreparably] harm him to the point he could not recover and live a healthy life[.]" (*Id.* at 73).

When asked the effect on Child if he were to be removed from Paternal Grandmother's care, however, Dr. Williams saw the matter quite differently:

> It's a much larger concern if you were to reverse the question in the roles because the caregiver he is with now is a central role to [Child]. It is his central caregiver[,] unlike the role of [Mother,] which is a visitor weekly.
>
> So, it would be a completely different evaluation, completely different contacts and much larger concerns regarding the impact on [Child] if [Paternal Grandmother] was to be removed from his life permanently.

(*Id.* at 73-74).

For all the reasons stated above, we conclude that DHS presented sufficient credible evidence to demonstrate that the termination of Mother's parental rights will best serve Child's emotional needs and welfare. The trial court did not abuse its discretion when it terminated Mother's parental rights pursuant to subsection (b). Mother's fourth issue does not merit relief.

- 23 -

In her fifth issue, Mother claims that the trial court abused its discretion when it permitted DHS to change Child's goal form reunification to adoption. (*See* Mother's Brief, at 54-57). We disagree.

We note our standard of review of a change of goal:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. . . .

*In re S.G.*, 922 A.2d 943, 946 (Pa. Super. 2007) (citation omitted).

In addressing the issue of a change of goal, this Court has said:

> By allowing [an agency] to change its goal to adoption, the trial court has decided that [the agency] has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition.

*In the Matter of N.C.*, 909 A.2d 818, 824 (Pa. Super. 2006) (citation omitted).

The record before us demonstrates that DHS has provided services to Mother since December of 2013. In spite of DHS' efforts, however, the testimony of Dr. Williams, cited above, and the parental capacity evaluation, (*see* DHS Exhibit 5), make it clear that Mother is incapable of caring for Child independently and that a change of goal to adoption is now the favored disposition in this case. The trial court did not abuse its discretion when it

changed Child's goal to adoption. ***See In re S.G.***, ***supra*** at 946. Mother's fifth issue does not merit relief.

In her final issue, Mother contends that the trial court abused its discretion when it failed to consider Child's preferences and failed to appoint an attorney to represent Child's legal interests.[4] (***See*** Mother's Brief, at 57-62). She claims that based on our Supreme Court's decision in ***In re Adoption of L.B.M.***, 161 A.3d 172 (Pa. 2017), the court was required to appoint separate, independent counsel to represent Child's interest.[5] We disagree.

This Court has explained that, with respect to termination of parental rights proceedings, the focus of the proceeding is on whether the parent is able to parent the child. Thus, "[t]he testimony or preference of the child(ren) is not required or permitted in an involuntary proceeding as the child cannot

---

[4] Although not pertinent to our decision, we observe that Mother did not request that the trial court appoint an attorney to represent Child's legal interests during the pendency of the proceedings before the trial court.

[5] Initially, we note that the portion of ***In re Adoption of L.B.M.*** that overruled ***In re K.M.***, 53 A.3d 781 (Pa. Super. 2012), and held "that Section 2313(a) requires the appointment of counsel who serves the child's legal interests in contested, involuntary [termination of parental rights] proceedings[.]" did not garner a majority of joinders. ***In re Adoption of L.B.M.***, ***supra*** at 180 (footnote omitted). Thus, it is not binding precedent and we do not apply its holding in the instant case. ***See MacPherson v. Magee Mem'l Hosp. for Convalescence***, 128 A.3d 1209, 1223 (Pa. Super. 2015), *appeal denied*, 161 A.3d 789 (Pa. 2016), *cert. dismissed*, 138 S. Ct. 354 (2017) ("[A] plurality opinion is not binding precedent.") (citation omitted).

cede his right to minimal proper nurturing." ***In re B.L.L.***, 787 A.2d 1007, 1014 (Pa. Super. 2001). Furthermore, "[t]he protection of the parents' and child's legal interests is assured by the mandatory requirement that they be represented throughout the proceedings by counsel; which is not a requirement in custody proceedings." ***Id.***

Thus, we conclude that, based on the law in effect at the time of the termination proceeding, the trial court did not abuse its discretion or commit an error of law when it permitted Child's guardian *ad litem* to represent Child's legal interests during the proceeding and did not require Child, then four years old, to testify. Mother's final issue does not merit relief.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/16/18